**WO** LMH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sheldon Walker, ) | No. CV 04-0691-PHX-MHM (LOA) |
| Plaintiff, ) | **ORDER** |
| vs. ) | |
| Dora Schriro, et al., ) | |
| Defendants. ) | |

Plaintiff Sheldon Walker, a state prisoner, filed this *pro se* civil rights action regarding conditions in Special Management Unit II, the highest custody level in the Arizona Department of Corrections (ADC). Presently pending are cross-motions for summary judgment, the parties' objections to each other's statements of facts, and Defendants' request to strike Plaintiff's statement of facts (Doc. ## 33, 35, 39, 45, 47). The Court will deny the objections and the request to strike, grant summary judgment in favor of Defendants and deny Plaintiff's cross-motion for summary judgment.

**I. Background**

It is undisputed that Plaintiff was validated as a member of a Security Threat Group known as Mau Mau and as a result, he was placed in a maximum custody arrangement called Special Management Unit II on June 8, 1999. In SMU II, the inmates are severely restricted in movement, and they lack privileges granted to inmates at lower custody levels. Plaintiff, unhappy with his circumstances, brought this lawsuit against ADC Director Dora Schriro,

SMU II Deputy Warden Conrad Luna, and Classification Committee Specialist Barbara Shearer. Plaintiff complained that (1) his due process rights were violated by his placement and retention in SMU II; (2) the conditions of SMU II violated the Eighth Amendment; and (3) the placement was retaliatory because he refused to incriminate himself by renouncing gang membership or by informing on other gang activities. Plaintiff sought only declaratory and injunctive relief.

Subsequently, Defendants moved for summary judgment, contending that there was no evidence to show that Plaintiff's constitutional rights were violated (Doc. #33). In support, they submitted statements by Todd Gerrish, Supervisor of the Security Threat Group Unit; Carson McWilliams, the current deputy warden of SMU II; and Stacey Crabtree, an ADC Classification Manager. Defendants also submitted excerpts from Plaintiff's deposition taken on November 10, 2005 (DSOF, Doc. #34).

Plaintiff responded and moved for summary judgment (Doc. ##35-36, 43-44). In support, he submitted copies of discovery responses, classification documents, excerpts from the deposition of former ADC Director Terry Stewart, a newspaper article, and a Director's Instruction dated December 29, 2005, increasing recreation time (Doc. #35). Defendants replied to Plaintiff's Response, and responded to Plaintiff's summary judgment motion (Doc. ##38, 57).

## II. Objections and Motion to Strike

Both parties filed line-by-line objections to each other's statements of facts, contending that certain statements are conclusory, unsupported and inadmissible (Doc. ##39, 45). Defendants then moved to strike Plaintiff's response to their summary judgment motion and his statement of facts (Doc. #47), and Plaintiff responded to the motion (Doc. #55). The Court will deny the motion to strike and all of the objections.

Although Defendants correctly contend that the local rules do not expressly provide for a combination cross-motion for summary judgment and response, the local rules also do not expressly prohibit the practice. Also, Defendants' complaint about reading Plaintiff's small handwriting is not persuasive. Like the Court, Defendants are accustomed to pro se

1 litigation, which often requires deciphering handwriting and the type of "scouring" that
2 Defendants believe they are not required to do. Also, despite Defendants' contention to the
3 contrary, the Court does not view Plaintiff's statement of facts in support of his cross-motion
4 and the statement of facts in support of his response as impermissible. Finally, regarding the
5 parties' objections to the statements of fact, the Court will on its own disregard those portions
6 that the Court believes are not based on personal knowledge or that are not based on
7 admissible evidence.

8 **III. Summary Judgment Standard**

9 A court must grant summary judgment if the pleadings and supporting documents,
10 viewed in the light most favorable to the non-moving party, "show that there is no genuine
11 issue as to any material fact and that the moving party is entitled to judgment as a matter of
12 law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
13 When considering a summary judgment motion, the evidence of the non-movant is "to be
14 believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty
15 Lobby, Inc., 477 U.S. 242, 248 (1986). These inferences are limited, however, "to those
16 upon which a reasonable jury might return a verdict." Triton Energy Corp. v. Square D. Co.,
17 68 F.3d 1216, 1220 (9th Cir. 1995).

18 Rule 56(c) mandates the entry of summary judgment against a party who, after
19 adequate time for discovery, fails to make a showing sufficient to establish the existence of
20 an element essential to that party's case, and on which the party will bear the burden of proof
21 at trial. Celotex, 477 U.S. at 322-23. Rule 56(e) compels the nonmoving party to "set forth
22 specific facts showing that there is a genuine issue for trial" and not to "rest upon the mere
23 allegations or denials of [the party's] pleading." The nonmoving party must do more than
24 "simply show that there is some metaphysical doubt as to the material facts." Matsushita
25 Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue
26 for trial unless there is sufficient evidence favoring the non-moving party. Anderson, 477
27 U.S. at 249. Summary judgment is warranted if the evidence is "merely colorable" or "not
28 significantly probative." Id. at 249-50.

## IV. Analysis

### A. Count I: Due Process in Placement and Retention in SMU II

#### 1. Placement

In the ADC, certain groups are designated as a Security Threat Group (STG) to help minimize the threat that gang activity poses to the safe and secure operation of the prison (Gerrish Decl. ¶ 3, Ex. A. Doc. #34). An STG is defined under ADC policy as:

> Any organization, club, association or group of individuals, either formal or informal (including traditional prison gangs), that may have a common name or identifying sign or symbol, and whose members engage in activities that include, but are not limited to; planning, organizing, threatening, financing, soliciting, committing or attempting to commit unlawful acts or acts that would violate the Department's written instructions, which detract from the safe and orderly operation of prisons.

(Id. ¶ 4). Validated STG members are housed in SMU II, a high security facility (Id. ¶ 11).

The Mau Maus were designated as an STG effective on October 11, 1998 (Gerrish Decl. ¶ 5, Ex. A, Doc. #34). Plaintiff was validated as a member of Mau Mau on March 10, 1999 (Id. ¶ 16). The validation process included notice and a hearing, and an evaluation of certain criteria (Id. ¶¶ 6-10). The information relied upon to validate Plaintiff included: (1) an address book found in another suspected inmate's cell that had Plaintiff's name in it; (2) an address book found in Plaintiff's cell that had other suspected members' names; (3) the Mau Mau Bi-Laws were found in Plaintiff's cell; (4) in another suspected inmate's cell, there were letters written by Plaintiff about Mau Mau business matters; and (5) a Mau Mau membership list was found in Plaintiff's cell (Id. ¶ 16; Pl's Dep. at 16, Ex. D, Doc. #34). There is no dispute that Plaintiff was given notice and opportunity to be heard at his validation hearing. He also had an opportunity to appeal, though his appeal was denied by the STG Validation Committee on May 7, 1999 (Gerrish Decl. ¶ 16). Not long thereafter, Plaintiff was transferred to SMU II.

The parties do not dispute that Plaintiff's initial placement in SMU II implicates a liberty interest requiring due process protections. And they could not, particularly after Wilkinson v. Austin, 125 S. Ct. 2384 (2005), in which the Supreme Court found that inmates in Ohio's prison system had a liberty interest in remaining free from maximum security

1 segregation units. An inmate may be deprived of his liberty interest as long as he is accorded
2 the proper procedural protections. For the initial decision to place an inmate in maximum
3 custody, due process is generally satisfied by notice of the factual basis for the placement and
4 an opportunity to be heard. Wilkinson, 125 S. Ct. at 2395-97; Hewitt v. Helms, 459 U.S.
5 460, 476 (1983). Although Plaintiff still maintains that he is *not* a member of Mau Mau
6 (PSOF ¶ 7, Doc. #36), he admits that the initial validation process "complied with the bare
7 minimum due process requirements" (Mot. Summ. J. at 3-4, Doc. #35; Resp. at 3, Doc. #43).
8 Thus, whether the STG validation procedures violated due process is not at issue. As
9 discussed next, Plaintiff's STG validation is important because it bears on the process he was
10 due to be retained in SMU II.

**2. Retention in SMU II**

12 The parties dispute whether the review of Plaintiff's continued retention in SMU II
13 violated due process. Plaintiff contends that his rights were violated because (1) beginning
14 in 2002, his retention reviews took place annually and not mid-year, and (2) the reviews were
15 not meaningful because (a) they were not forwarded to the *central* classification committee,
16 so he could not appeal, and (b) his only option is to renounce membership in a gang that he
17 does not belong to, or to inform on persons with false stories. Defendants respond that (1) a
18 paper review was conducted mid-year and an in-person review annually, and (2) Plaintiff
19 could appeal annually, and he may make any statement at that review.

20 The requirements of due process are flexible and variable depending upon the
21 particular situation being examined. Greenholtz v. Inmates of the Nebraska Penal and
22 Correctional Complex, 442 U.S. 1, 12 (1979). Traditionally, the amount of process due is
23 determined by the framework established in Matthews v. Eldridge, 424 U.S. 319 (1976).
24 This requires a consideration of (1) the private interest that will be affected by the official
25 action, (2) the risk of an erroneous deprivation of such interest through the procedures used,
26 and the probative value, if any, of additional or substitute procedural safeguards, and (3) the
27 government's interest, including the function involved and the fiscal and administrative
28 burdens that the additional or substitute procedural requirement would entail. Matthews, 424

- 5 -

U.S. at 335. In the prison context, the private interest of avoiding placement in SMU II "while more than minimal, must be evaluated, nonetheless, within the context of the prison system and its attendant curtailment of liberties." Wilkinson, 125 S. Ct. at 2395.

There is no precedent which sets forth the precise standard for the process that must be accorded to an inmate in Plaintiff's circumstances: potentially indefinite segregation after validation as a member of a Security Threat Group. The starting place for this analysis, however, is dicta in Hewitt v. Helms, 459 U.S. 460 (1983). The Hewitt Court addressed the degree of process due for an inmate who was placed in segregation following a riot and pending an investigation of his role in the riot. In those circumstances, all that was required was an informal, nonadversary review of the information supporting the decision to place him in segregation. Id. at 472. In a footnote, the Supreme Court addressed the type of review required to retain an inmate in segregation. Administrative segregation "may not be used as a pretext for indefinite confinement," which means that prison officials must engage "in some sort of periodic review of the confinement of such inmates." Id. at 477 n.9. The Court further explained:

> This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner–which will have been ascertained when determining to confine the inmate to administrative segregation–and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner.

Id. Prison officials are entitled to rely on their "purely subjective evaluations and predictions of future behavior," as well as their evaluations of risk to the institution. See id. at 474.

Prison officials unquestionably view Plaintiff as an ongoing threat to security because he was validated as a member of the Mau Mau STG (Gerrish Decl. ¶ 19). He will not be transferred from SMU II unless he renounces membership in Mau Mau, successfully debriefs, and passes a polygraph test (Gerrish Decl. ¶¶ 12, 20; Crabtree Decl. ¶ 11, Exs. A and C, Doc. #34). Plaintiff's contention that he should be transferred because he has not committed any misconduct while in prison is unpersuasive because his STG membership is the basis for his segregation, not his disciplinary history. Thus, his placement in SMU II is

1  not a "pretext for indefinite confinement." Hewitt, 459 U.S. at 477 n. 9. As long as Plaintiff
2  has an opportunity to debrief and be transferred, the risk of error in the retention process is
3  minimal. Plaintiff testified at his deposition that as far as he knows, he can debrief at any
4  time (DSOF Ex. D at 44). Plaintiff protests that he cannot renounce and debrief because he
5  was not and never has been a member of Mau Mau, and he would be forced to create false
6  stories about gang activity. He has admitted, however, that the validation process satisfied
7  due process. His claim that he cannot renounce and debrief is an improper backdoor attack
8  on the validation process.

9  Defendants have also submitted evidence that if Plaintiff remains misconduct free, a
10 step-down program may be available to him that would permit him to be transferred to a
11 close-custody unit in the general population (Resp. at 8 n. 6, Doc. #38; Dep't Ord. 806.08,
12 806.09 (1.4) Attach. 1, Doc. #39). The first set of inmates was scheduled to begin the step-
13 down program at the end of May 2006 (Reply at 8, Doc. #57). Thus, Plaintiff may have an
14 alternate method besides debriefing to obtain a possibility of release from SMU II.

15 In addition to the open opportunity for debriefing and the new step-down program,
16 there are periodic retention reviews of Plaintiff's classification in SMU II. As indicated in
17 Hewitt, 459 U.S. at 472, 477 n.9, these reviews may be informal and nonadversary, and
18 prison officials are not required to accept submission of additional evidence or statements.

19 There is some dispute about the frequency of the reviews. Defendants claim the
20 reviews occurred every 180 days (Crabtree Decl. ¶¶ 15-18), and alternated between an "in
21 person" review and a "paper" review (Resp. at 4, Doc. #38), but they submit no documentary
22 evidence to support that Plaintiff was actually reviewed with that frequency. Plaintiff asserts
23 that beginning in 2003, his reviews changed from semi-annual to annual, and he submits
24 copies of his notices and score sheets to prove his claim (Pl.'s Mot. Summ. J. at 4-5 & Exs.
25 B, D; see also Pl.'s Dep. at 30). Plaintiff's position is supported by a modification to
26 Department Order 801 that became effective on October 25, 2005, which requires maximum
27 custody inmates to be reviewed 60 and 180 days after their initial placement, and then
28

1 annually thereafter (Resp. at 4 n. 2, Doc. #38; Dep't Ord. 801.06(1.3), Attach. 3, Doc. #39).
2 Thus it is clear that now, Plaintiff's review takes place annually.

3 The time elapsing between reviews is only one factor to be considered in determining
4 whether due process was satisfied. Although an annual review did not to satisfy due process
5 in Toussaint v. McCarthy, 801 F.2d 1080, 1101 (9th Cir. 1986), the court expressly declined
6 to state what time period was required. After remand and a later appeal, the Court of Appeals
7 found that review every 120 days satisfied due process, and the district court could not
8 impose a 90-day review period. Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990).
9 In the Court's opinion, because there is no dispute that Plaintiff was properly validated as an
10 STG member and because he has an opportunity to debrief at any time, the time that elapses
11 between his retention reviews need not be brief. An annual review suffices.

12 In addition, the parties do not dispute that when the annual reviews occurred, Plaintiff
13 had notice and an opportunity to submit information. He could also appeal the classification
14 decision made in annual reviews. These protections go beyond what was required in Hewitt,
15 459 U.S. at 477 n.9. Although Plaintiff believes these reviews were pretextual because he
16 would not be transferred without renouncing his gang membership, there is no evidence to
17 show any pretext on the part of the Defendants, who were entitled to rely on his validation
18 as an STG member. Accordingly, because there is no evidence to show that Plaintiff's
19 retention reviews contravened due process, Defendants are entitled to summary judgment on
20 this claim.

21 **B. Retaliatory Placement in SMU II**

22 Plaintiff alleged that his placement in SMU II is retaliatory for his refusal to
23 incriminate himself and inform on others. A viable claim of First Amendment retaliation
24 contains five basic elements: (1) an assertion that a state actor took some adverse action
25 against an inmate (2) because of (3) that prisoner's protected conduct and that such action
26 (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered
27 more than minimal harm) and (5) was not narrowly tailored to advance a legitimate
28 correctional goal. Rhodes v. Robinson, 408 F.3d 559, 567-58 (9th Cir. 2005); Hines v.

1  Gomez, 108 F.3d 265, 267 (9th Cir. 1997).  These types of claims must be evaluated in light
2  of the deference and flexibility that must be accorded to prison officials.  Pratt v. Rowland,
3  65 F.3d 802, 807 (9th Cir. 1995).
4        Defendants correctly contend that there is no evidence that Plaintiff's refusal to
5  renounce his gang membership interferes with his Fifth Amendment right not to incriminate
6  himself.  The Fifth Amendment protects against disclosures that a witness reasonably
7  believes could be used in a criminal prosecution or leads to other evidence that might be so
8  used.  Hiibel v. Sixth Judicial Dist. Court of Nevada, 542 U.S. 177, 190 (2004); United States
9  v. Bodwell, 66 F.3d 1000, 10001 (9th Cir. 1995).  Defendants assert that under prison policy,
10  the information obtained in a debriefing is not for the purpose of future criminal proceedings
11  but is to ensure that the inmate has withdrawn from the STG, to provide information about
12  the STG so it can be managed, and to determine if the inmate requires protection (Gerrish
13  Decl. ¶ 13 & Attach. 1, Dep't Order 806.06 (1.1)).  There is no evidence to show that the
14  information gained in a debriefing has ever been used in a criminal proceeding by the State.
15  See Baxter v. Palmigiano, 425 U.S. 308, 317 (1976) (State did not seek to make evidentiary
16  use of silence at a disciplinary hearing in any criminal proceeding).  There is no evidence to
17  show that any disclosures Plaintiff might make regarding gang involvement would be used
18  against him in a criminal prosecution.  Thus, his constitutional rights were not implicated by
19  the debriefing requirement.
20        Moreover, Defendants also correctly contend that the evidence shows that Plaintiff's
21  placement in SMU II is not retaliatory but is for a legitimate correctional goal.  It is not
22  disputed that Plaintiff is viewed by prison officials as an ongoing security threat because of
23  his validation as a gang member.  Defendants are entitled to summary judgment on this
24  retaliation claim.
25        **C.  Conditions of SMU II**
26        Under the Eighth Amendment, punishment may not be "barbarous"  nor may it
27  contravene society's "evolving standards of decency."  Rhodes v. Chapman, 452 U.S. 337,
28  346 (1981).  Only deprivations denying the minimal civilized measure of life's necessities

- 9 -

are sufficiently grave for an Eighth Amendment violation. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation omitted). These are "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." Rhodes, 452 U.S. at 348.

An Eighth Amendment claim also requires a sufficiently culpable state of mind by the Defendants, known as "deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834 (1994). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. Id. at 837.

**1. Exercise, Sunlight & Fresh Air**

The deprivation of outdoor exercise for inmates who are under long-term segregation violates the Eighth Amendment. Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996). Five hours of exercise per week has been found to be constitutionally sufficient. See Baptisto v Ryan, 2006 WL 798879, at *33 (D. Ariz. March 28, 2006) (collecting decisions of the Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth Circuits). Plaintiff admits that he has the opportunity for exercise six hours per week.

Plaintiff also states that the yard has no direct sunlight and often no sunlight at all (Mot. Summ. J at 11). The recreation yard has cement walls with a steel mesh top that allows fresh air and sunlight into the yard (McWilliams Decl. ¶ 26). It is thus undisputed that in the recreation yard, Plaintiff has light, except on days that are not sunny. Infrequent deprivation of sunlight, direct or indirect, does not constitute a denial of the "minimal civilized measure of life's necessities." Rhodes v. Chapman, 542 U.S. 337, 347 (1981).

Plaintiff further asserts that if he needs to use the restroom during his allotted time period, he loses any time remaining for exercise (Mot. Summ. J at 11). He has not explained why he cannot use the restroom in his cell *before* he is taken to the recreation yard. And he does acknowledge that if he needs to use the restroom, his request is heeded. To determine whether an Eighth Amendment violation has occurred, a Court should consider the

circumstances, nature and duration of a deprivation of these necessities. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000). "The more basic the need, the shorter the time it can be withheld." Hoptowit v. Ray, 682 F.2d 1287, 1259 (9th Cir. 1982). Given that Plaintiff is in a highly restrictive environment and has the chance to use the restroom before going to the recreation yard, the failure to return him to the yard after heeding his restroom request does not rise to the level of an Eighth Amendment violation.

Moreover, Plaintiff has not connected this claim to any of the named Defendants; i.e., he has not alleged that he asked Director Schriro, Deputy Warden Luna or Classifications Specialist Shearer for a restroom break or otherwise informed them that he was losing recreation time due to restroom breaks. To demonstrate deliberate indifference, a prisoner must show that the official knew of and disregarded an excessive risk to inmate safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). There is no evidence to show that these Defendants acted with deliberate indifference.

**2. Lighting**

The Eight Amendment requires that inmates be given appropriate lighting. Keenan, 83 F.3d at 1090. Plaintiff asserts that he lives under constant illumination, and he cannot sleep at night because a cloth he uses to cover his eyes often falls off (Mot. Summ. J. at 11). Defendants contend that the cells do not have constant illumination. On weekdays, the lights are dimmed from 10 p.m. to 4 a.m. and on weekends, from midnight to 4 a.m. The dimmed lighting is equivalent to a night light (McWilliams Decl. ¶ 8). The dimmed lighting is (1) for conducting welfare checks of inmates, with less disturbance to them than with the use of flashlights, and (2) to maintain a safe environment, as inmates already are able to create weapons and other contraband in the dimmed lighting and the situation would be worse with total darkness (McWilliams Aff. ¶¶ 9-13). In light of this evidence, there is nothing to show that Defendants acted with deliberate indifference in dimming the lights at night for the purposes of inmate health and security.

1     **3. Food**

2     The Eighth Amendment requires that inmates be provided with food that is adequate to maintain health. Keenan, 83 F.3d at 1091; LeMaire v. Maas, 12 F.3d 1444, 1445-46 (9thy Cir. 1993). Plaintiff alleged in his Complaint that he was given limited amounts of food as punishment. Defendants assert that SMU II inmate receive 2800 calories each day, which is appropriate for a sedentary lifestyle (McWilliams Decl. ¶ 28), but Plaintiff claims that often items are missing so he does not always receive 2800 calories (PSOF ¶ 43). He also receives an ovo-lacto diet for religious reasons (DSOF Ex. D at 45). Plaintiff stated at his deposition that he was 5'7" and 175 pounds, but he now claims that at the time of his deposition on November 10, 2005, he had gained weight from extra food that was available during the holiday season and he normally weighs 160 pounds (DSOF Ex. D at 64; PSOF ¶¶ 44-48).

13     Even if Plaintiff normally weighs 160 pounds, there is no evidence to show that is significantly underweight or malnourished. In addition, there is no evidence to show that any of the named Defendants were aware that at times, Plaintiff did not receive the same quantities of food that other inmates in SMU II were receiving. Without any such evidence, deliberate indifference cannot be shown.

18     **4. Isolation**

19     Plaintiff alleges that he has served 7 years in isolation and faces another 18 years. Courts must identify the specific conditions that violate the Eighth Amendment and cannot rely on a vague conclusion of the "totality of conditions." Hoptowit, 682 F.2d at 1247. The Ninth Circuit has found that "administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence." Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (citing Toussaint, 801 F.2d at 1091-92). Even so, the Ninth Circuit has also recognized that harsh conditions such as SMU II can cause psychological harm. See Miller v. Stewart, 231 F.3d 1248, 1252 (9th Cir. 2000) (in death row case, experts stated that conditions such as SMU can cause psychological decompensation to the point of incompetency); Comer v. Stewart, 215 F.3d

1  910, 916 (9th Cir. 2000) (recognizing that harsh conditions of Arizona's death row can
2  adversely affect mental health). Other courts, however, have found that standing alone, the
3  isolation inherent in segregation does not violate the Eighth Amendment. In re Long Term
4  Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 472 (4th Cir.
5  1999); Jackson v. Meachum, 699 F.2d 578, 581-83 (1st Cir. 1983). While it is clear that
6  something more than isolation is required to violate the Eighth Amendment, there is no
7  precise standard. Regardless, the Court need not define the standard because the evidence
8  does not show that Plaintiff is incarcerated in isolation.

9  Defendants submit evidence that SMU II inmates have a variety of opportunities for
10 social contact. They may (1) make one five-minute phone call per week, (2) send and
11 receive letters, (3) communicate with other inmates in the pod from cell to cell,
12 (4) communicate with staff and counselors, and (4) have non-contact visitation weekly for
13 two hours and up to four visitors (McWilliams Decl. ¶¶ 15, 18, 20-21, 23-24). They also
14 have access to a library for reading and legal materials and may order materials by mail, and
15 they may have a television and walkman radio in their cells (McWilliams Decl. ¶¶ 17 19).

16 At his deposition in November 2005, Plaintiff admitted that he availed himself of
17 these opportunities. He stated that he corresponded with his family members and made his
18 weekly phone call (DSOF Ex. D at 74-75). He also said that he received regular visits from
19 family members (Id. at 41, 70, 73-75). He uses his walkman to listen to tapes of his wife and
20 language tapes, and he has books in his cell (Id. at 40, 84-85). He watches a television show
21 called "Prison Break," and he watches sports programs (Id. at 82-84). His spends his time
22 practicing Islam, reading religious materials, and studying various subjects (Id. at 39-41, 85-
23 88).

24 Now in his Response, Plaintiff claims that his relatives have since stopped visiting due
25 to the stress of driving so far, the difficulty in finding an open time slot, and the hardship of
26 seeing Plaintiff locked in a cage like an animal (PSOF ¶ 40). Even if Plaintiff's visits have
27 stopped, the record does not show that visitation is banned or impossible, only that Plaintiff's
28 visitors have chosen not to bear the hardship. This claim does not rise to the constitutional

1  level. See Overton v. Bazzetta, 539 U.S. 126, 137 (2003) (two-year ban on visitation was
2  permissible though a case where privileges were withdrawn longer or permanently would
3  "present different considerations"); Toussaint, 801 F.2d at 113-14 (denial of contact
4  visitation based on sound penological justifications is constitutional).

Plaintiff also claims in his Response that his wife and friends have stopped writing to him because they were discouraged by the fact that his incoming and outgoing mail would be delayed and sometimes lost (PSOF ¶¶ 59-60). He has not, however, identified when this occurred or explained how he knows that his mail was lost. He also has not asserted that he has been banned from using the mail. It is a common knowledge that relationships between inmates and persons outside the prison walls often become strained. The fact that mail may have been negligently lost did not place Plaintiff in total isolation. Both visits and mail are available to Plaintiff and if he (or his family and friends) chooses not to avail themselves of these avenues of communication, the fault does not lie with the prison. Consequently, the evidence does not show that Plaintiff is isolated to a degree that would violate the Eighth Amendment. Defendants are entitled to summary judgment on this claim as well.

**IT IS ORDERED:**

(1) Defendants' Objections (Doc. #39), Plaintiff's Objections (Doc. #45) and Defendants' Motion to Strike (Doc. #47) are **denied**.

(2) Defendants' Motion for Summary Judgment (Doc. #33) is **granted**. Plaintiff's Motion for Summary Judgment (Doc. # 35) is **denied.** The Clerk of Court must enter judgment accordingly.

DATED this 23rd day of September, 2006.

_____
Mary H. Murguia
United States District Judge

- 14 -